OPINION OF THE COURT
Michael A. Corriero, J.
In the early morning hours of May 23, 1997, the body of Michael McMorrow was found floating in the lake at Central Park. His body was badly mutilated; numerous slash and stab wounds covered his head, torso and extremities, his abdomen had been cut open and part of his intestines were exposed.
The events which led to that grim discovery, the arrest of two 15 year olds, Daphne Abdela and Christopher Vasquez, for the murder, and the disposition of their cases were the subject of intense media coverage.
Indicted for murder in the second degree, both were ultimately convicted of manslaughter in the first degree — Daphne Abdela after a plea of guilty and Christopher Vasquez after a jury trial.
The case against Christopher Vasquez rested entirely on circumstantial evidence. There were no eyewitnesses to the crime, except the accused teenagers. As the only witnesses to the slaying, they were both unavailable to the prosecution as a matter of law. Daphne Abdela invoked her privilege against self-incrimination when requested to testify after her plea; the *857 defendant could not be compelled to testify against his will pursuant to his privilege against self-incrimination.
This decision addresses several issues raised during the course of the trial of Christopher Vasquez:
First, whether a statement made by Daphne Abdela during her plea allocution was a declaration against penal interest and therefore admissible as an exception to the hearsay rule;
Second, whether and to what extent would the defendant be permitted to introduce evidence impeaching the credibility of Abdela’s plea allocution, in her absence;
Third, whether the prosecution would be permitted to introduce evidence of a statement made by the defendant to a classmate several weeks before the incident, that he was carrying a knife for protection;
Fourth, whether lesser included offenses should be submitted to the jury at the request of the defense.
I
DAPHNE ABDELA’S PLEA ALLOCUTION
a. The factual context
At about 12:47 a.m. on May 23, 1997, Daphne Abdela’s father, concerned about his daughter’s whereabouts, called the police to report her missing. Police officers, responding to the call, met Mr. Abdela in the lobby of the family’s residence. They were informed by a doorman that Daphne Abdela and a boy were in the building washroom on the lobby level. When they opened the door to the washroom, Abdela and Christopher Vasquez were observed sitting naked in a bathtub. Abdela told the officers that they had fallen roller-blading and were washing themselves off. The police, accepting the explanation, told them to dress and escorted both of them to Abdela’s apartment, and left. Abdela’s father called defendant Vasquez’s mother and she came to the building and picked up her son at about 1:30 a.m.
At about 1:34 a.m. that same evening, the police received a 911 call from Abdela, wherein she told the police that she saw a body floating in the Central Park lake. She reluctantly disclosed her name and address. When the police arrived at her home she told them that she had witnessed a murder and that her companion, Christopher Vasquez, was responsible for it. She identified the deceased as an older man she had met *858 several weeks previously at an Alcoholics Anonymous meeting. In the company of her father, she then took the police to the lake, where the body of the deceased was discovered.
Abdela gave the police information about Christopher Vasquez’s address and accompanied them to a five-story walk-up building in the East nineties, where Vasquez lived with his mother. After Christopher Vasquez was located and taken into custody, both he and Abdela were charged with the murder of 44-year-old Michael McMorrow.
b. The procedural context
From the outset of the case, Abdela’s attorney sought to cooperate with the prosecution and asserted that his client was merely a witness to the stabbing and not an accomplice. From June 1997 through November 1997, Abdela and her attorney met several times with law enforcement officials to discuss her involvement. (Tr. Tr., at 1827-2028, 2233-2335.)[1]
After her indictment, Abdela continued in her attempt to persuade the prosecution that she was a witness, despite her admitted efforts to help the defendant Vasquez cover up the crime by directing him to “gut” the deceased so that his body would not float, helping him to dispose of the body in the lake, and destroying the deceased’s identification.
Sometime in September 1997, after several discussions with prosecutors pursuant to “Queen for a day”[2] agreements, Abdela admitted her involvement was more than that of a witness. She stated that she saw the defendant Vasquez and the deceased in a struggle, Vasquez was wielding a knife and she helped the defendant by kicking the deceased, causing him to fall to the ground. Vasquez then jumped on top of the deceased and continued to stab him. (Tr. Tr., at 2315-2320.)
On November 6, 1997, while these discussions were taking place between Abdela and the prosecution, Vasquez’s attorney served a notice of intention to raise the affirmative defense of extreme emotional disturbance, pursuant to CPL 250.10. The defendant submitted reports of psychiatrists and psychologists in support of the defense. The prosecution also had an opportunity pursuant to the Criminal Procedure Law to examine the defendant.
*859 On February 24, 1998, Abdela’s counsel and the prosecutrix appeared in chambers for an in camera discussion regarding a possible disposition of Abdela’s case. At the conference, initiated by Abdela’s counsel, it was revealed that the prosecution had offered Abdela a plea to manslaughter in the first degree on condition that she receive the maximum sentence for that crime, [3] years and 4 months to 10 years.3 The plea did not require Abdela to cooperate or testify against her codefendant Vasquez. (See, transcript of Feb. 24, 1997 proceeding, unsealed on consent of Abdela; Tr. Tr., at 1949-1950.)
On March 11, 1998, pursuant to the plea agreement, Abdela pleaded guilty to manslaughter in the first degree. She was sentenced to a maximum term of 3 years and 4 months to 10 years on April 2, 1998. During her plea allocution she stated, in relevant part, reading from a prepared statement, that:
“On May 23, 1997, I participated in the assault that caused the death of Michael McMorrow * * *
“At some point during the struggle between Mr. McMorrow and Christopher Vasquez, I struck Mr. McMorrow and caused Mr. McMorrow to fall to the ground, by kicking his feet out from under him which caused him to fall backwards.
“At the time I took this action I saw that Mr. Vasquez was using a knife in his assault on Mr. McMorrow.
“My actions were taken by me to aid Mr. Vasquez and to cause serious physical injury to Mr. McMorrow”.
Subsequent to the plea, the lead prosecutrix accepted another assignment which prevented her from continuing with the case. She was replaced by another prosecutor in July 1998.
The new prosecutor sought to persuade Abdela to testify as a witness. A meeting was arranged between the new prosecutor and Abdela at the detention facility where she was serving her sentence. A representative of her attorney was present. After the meeting, Abdela’s attorney notified the prosecution, defendant Vasquez’s attorney and the court, both by letter and at a court proceeding, that Abdela would not testify as a witness for either side. Moreover, if called as a witness she would invoke her privilege against self-incrimination.
Counsel for defendant Vasquez and the prosecution did not move to contest Abdela’s basis for invoking the privilege and both agreed that for the purposes of trial and evidentiary rulings she would be considered “unavailable” to both sides. (See, *860 hearing transcript, Sept. 23, 1998, at 1-10; see, transcript of decision on admissibility of plea allocution, Oct. 1, 1998, at 1-6; see also, Tr. Tr., at 1641-1644, 2193-2196.)
The prosecution then sought a pretrial ruling concerning the admissibility of portions of Abdela’s plea allocution as a declaration against her penal interest pursuant to the Court of Appeals decision in People v Thomas (68 NY2d 194). The Thomas case held that a plea allocution of a nontestifying codefendant could be used at trial as a declaration against penal interest, provided certain safeguards and indicia of reliability were present.
On September 23, 1998, a hearing on the potential admissibility of parts of the plea allocution was conducted and this court ruled, assuming proof of sufficient indicia of reliability at trial, that the Thomas doctrine would permit use of that portion of the plea allocution that described and explained Abdela’s conduct at the time of the crime.
On November 2, 1998, immediately prior to the commencement of jury selection, the defense withdrew its notice of intention to raise the defense of extreme emotional disturbance, and instead proceeded on the theory that Abdela was solely responsible for the death of Michael McMorrow and that the defendant was merely an innocent bystander. (See, defense opening statement, Tr. Tr., at 63-66.)
Consequently, Abdela’s role on the night of the homicide became a major issue at the trial. During the course of the trial, the People sought admission of the factual portion of Abdela’s plea allocution on their direct case to prove elements of the murder charges and to describe Abdela’s role in the death of Michael McMorrow.
c. The law
The Sixth Amendment of the United States Constitution provides in part: “In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him”.
Confrontation implies the right to see, to hear and, in order to effectively confront the witness, to cross-examine.
The rule against hearsay recognizes the fundamental importance of cross-examination as a valuable tool to test the reliability of information presented at trial. The relationship between the Confrontation Clause and the hearsay rule was discussed by the Supreme Court in Ohio v Roberts (448 US 56, *861 66): “In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate ‘indicia of reliability.’ Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.”
The Confrontation Clause of the Sixth Amendment has consistently been construed to permit use of declarations of individuals who have not been subject to cross-examination, provided stringent standards assure the degree of reliability and probative value necessary to substitute for a defendant’s loss of the opportunity to cross-examine the declarant. (See, Chambers v Mississippi, 410 US 284; Ohio v Roberts, 448 US 56, supra.)
An exception to the hearsay rule, the declaration against penal interest is founded on the commonsense assumption that one will not “ordinarily make a statement which jeopardizes his interest by subjecting himself or herself to criminal prosecution and incarceration.” (People v Settles, 46 NY2d 154, 168.) Therefore, absent other motivations, when an individual makes a declaration against penal interest, “he is responding to a truth-revealing compulsion as great as that to which he would likely be subjected if cross-examined as a witness.” (People v Maerling, 46 NY2d 289, 295; People v Thomas, supra, at 200-201.) Stated otherwise, the stringent standards applied for determining whether a statement qualifies as a declaration against penal interest operate also to assure the degree of reliability and probative value necessary to substitute for a defendant’s loss of the opportunity to cross-examine the declarant. (People v Thomas, supra, at 201; see also, People v Guidice, 192 AD2d 383 [1st Dept 1993].)[4]
The Court of Appeals, as aforesaid in Thomas (supra), held that statements contained in a plea allocution of a codefendant may, in limited circumstances, be received in evidence as a declaration against penal interest.
The Court noted, however, that:
*862 “Not all plea allocutions, or statements contained in plea allocutions, meet these criteria for admission as declarations against penal interest. As a category, therefore, statements in plea allocutions are neither admissible nor inadmissible as declarations against penal interest.
“On one level, a declarant by pleading guilty to a felony is plainly acting contrary to his or her penal interest * * *
“But on another level, it is equally plain that a declarant would rarely consent to a plea bargain if it did not in some sense also serve his or her penal interest * * * Because this dual interest exists, the particular statements in plea allocutions claimed to be admissible as declarations against penal interest must be examined in the context of each case.” (People v Thomas, 68 NY2d 194, 198-199, supra.)
d. The criteria
“Hearsay evidence is admissible as a declaration against penal interest only if four prerequisites are met: (1) the declarant must be unavailable to give testimony, whether by reason of absence from the jurisdiction, refusal to testify on constitutional grounds or death; (2) the declarant must have been aware at the time of its making that the statement was contrary to his penal interest; (3) the declarant must have competent knowledge of the underlying facts; and (4) there must be sufficient competent evidence independent of the declaration to assure its trustworthiness and reliability”. CPeople v Thomas, supra, at 197.)
At the trial, neither the defendant nor the prosecution disputed the “unavailability” of the declarant or her knowledge of the underlying facts.
Thus, the prosecution had the burden of demonstrating that Abdela was aware at the time of her plea allocution that her statement was against her penal interest and that there was sufficient independent evidence of the statement’s reliability.
The plea in this case was clearly against Abdela’s penal interest and she was fully cognizant of the significant consequences of her allocution. Prior to her plea, aside from her initial statements that she was a witness to the stabbing and merely helped the defendant in an effort to cover up the crime, there was no direct evidence of her role in the homicide. By her plea, she waived the presentation of defenses or mitigating factors that could have affected her culpability. She became a convicted felon, subject to incarceration for 3 years and 4 months to 10 years in a secure facility, with the possibility of *863 enhanced punishment in the future. The fact that she pleaded to a lesser crime than murder and therefore limited her jail exposure is not determinative; were that the case, then virtually all plea allocutions would be inadmissible. This, of course, is contrary to the holding of Thomas (supra).
Further, at the time of the plea there was no plan or agreement to use Abdela as a witness in defendant Vasquez’s trial. Her cooperation was not required as part of the plea agreement, nor was there any contemplation, at the time of the plea, that the allocution would be used in the prosecution of defendant Vasquez. There was no evidence whatsoever that Abdela was attempting to curry favor or shift blame in exchange for a more favorable disposition. Indeed, Abdela’s steadfast refusal to testify against defendant Vasquez, and her attorney’s statement that she would invoke her Fifth Amendment privilege if called to testify, belies any willingness or plan on her part to aid the prosecution in convicting Vasquez. (See, transcript of Sept. 9, 1998 proceeding.) The fact that such a plea was offered to Abdela may well have been the result of the prosecutor’s assessment of the evidence against her, which led to the conclusion that the plea was a fair and just compromise, given the posture of the case at that time. (See, transcript of Feb. 24, 1998 proceeding.) This, of course, in no way detracts from the disserving nature of the allocution as it relates to Abdela.
At the time of her plea, Abdela had no discernable motive or need to falsely implicate her codefendant. She did not stand to gain anything by inculpating defendant Vasquez. She had done so since the beginning. A comparison of Abdela’s plea allocution with her prior statements to law enforcement officials reveals that she consistently described Vasquez as the knife wielder. What changed was the extent of her participation in the crime. Far from diminishing her culpability at Vasquez’s expense, her allocution moved her from the status of a witness to an active participant, thereby increasing her potential criminal liability. The fact that Abdela’s active role was not initially disclosed does not render the allocution unreliable. It was entirely possible that a complete account of the events of May 23, 1997 was revealed gradually.
The fourth prerequisite for admission of a declaration against penal interest, which the Thomas Court recognized as the most important factor, calls for the existence of supporting evidence, independent of the hearsay declaration, which supports the assertions made, and thereby assures their trustworthiness and reliability. There must be significant independent indicia of *864 reliability and truthfulness as to substitute for the defendant’s opportunity to cross-examine the declarant. There is no precise formulation of the proof which would constitute sufficient supportive evidence of a declaration against penal interest. “The crucial inquiry focuses on the intrinsic trustworthiness of the statement as confirmed by competent evidence independent of the declaration itself.” (People v Settles, 46 NY2d 154, 169, supra.)
At that point in the trial when the prosecution sought to introduce the plea allocution on their direct case, several independent pieces of evidence had already been placed before the jury, which directly corroborated the facts as allocated to by Abdela. The following supportive evidence was adduced on the prosecution’s direct case:
1. Abdela and Vasquez were the last people to be seen with Mr. McMorrow prior to his death and they were walking with him at approximately 11:00 p.m. in the direction of the lake where the crime took place;
2. Within 15 minutes after a police officer in Central Park heard two screams of a male voice in the vicinity of the lake where the deceased’s body was ultimately found, the officer observed the defendants roller-blading away from the general direction of the deceased’s body;
3. The defendants were observed together in a bathroom in the lobby of Abdela’s apartment building washing blood off of each other;
4. Defendant Vasquez’s blood was found in significant quantities at the crime scene, whereas none of Abdela’s blood was found at the crime scene, nor on any clothing that was recovered;
5. At the time of arrest, defendant Vasquez was observed to have many injuries consistent with a struggle, thus supporting Abdela’s statement that the deceased and Vasquez were engaged in a struggle. Defendant Vasquez also had a knife wound to his left index finger which the People’s Medical Examiner testified was consistent with defendant Vasquez having cut himself during the attack;
6. A folding knife was found in defendant Vasquez’s bedroom. The knife contained DNA which was consistent with a mixture of defendant Vasquez’s blood and the deceased’s blood, but which could not have come from Abdela. This forensic evidence corroborated Abdela’s statement in the allocution that defendant Vasquez was using the knife;
*865 7. Corroborative of Abdela’s statement that she kicked the deceased causing him to fall backward were the autopsy report and photographs of the deceased. The People’s Medical Examiner testified that three distinct contusions to the deceased’s right thigh were consistent with a kick from Abdela’s roller blades, and thus independently supported Abdela’s statement in the allocution that she kicked the deceased’s legs out from under him;
8. The deceased died from multiple stab and incise wounds, and according to the People’s Medical Examiner, the wounds were consistent with the knife found in defendant Vasquez’s apartment.
In sum, Abdela’s allocution was in no way inconsistent with other evidence adduced at that point in the case. Indeed, it was corroborated significantly by the forensic evidence which supported her description as to how the deceased fell to the ground and the manner and the instrumentality by which the wounds were inflicted. Any presumption of unreliability attaching to an accomplice’s statement dissolved in the face of such independent corroboration, combined with the consistency of her statements concerning the conduct of the defendant.
Significantly, the rule permitting admission of declarations against penal interest does not allow for admission of non-selfinculpatory parts of a statement. The Court of Appeals in Thomas (68 NY2d 194, 198, supra) stated: “[Wjithin practical limitations, only the portion of the statement opposed to declarant’s interest should be admitted”. It follows that reference to the identity of the person with whom Abdela acted did not add to or enhance her culpability. Therefore, the identity of the person with whom she acted was irrelevant in terms of the extent of Abdela’s culpability. As such, reference to Vasquez’s name would have been deleted and a pronoun substituted. However, the defense requested that Vasquez’s name not be deleted. The defense’s position was that if the statement was otherwise admissible, Vasquez’s identity would have been apparent to the jury. (See, Tr. Tr., at 1857-1858.)
Reference to Vasquez’s conduct, as opposed to his identity, however, was relevant in establishing the extent of Abdela’s criminal liability, and did fall within the hearsay exception.
The law requires that a factual and legal basis exist for a plea of guilty in order to justify punishment for the crime. Abdela pleaded guilty to the crime of manslaughter in the first *866 degree,[5] under the theory that she “acted in concert” with another during the commission of that crime. (Penal Law § 20.00.)
Every crime is composed of two essential elements — a mental component, the mens rea, and a physical component, the actus reus. The physical component or actus reus of manslaughter in the first degree, is causing the death of another; the mental component, or mens rea, is intent to cause serious physical injury. Thus, in order to be guilty of that crime, the prosecution must prove that a person caused the death of another and did so with the intent to cause serious physical injury. The prosecution contended that Abdela participated in the death of Michael McMorrow, in that she acted in concert with defendant Vasquez, i.e., she “intentionally aided” him in causing the death of Mr. McMorrow, with the intent to cause him serious physical injury.
In order for Abdela to have validly pleaded to manslaughter in the first degree she had to admit to facts indicating that when she aided another, whose acts resulted in the death of a person, she did so with the intent to cause serious physical injury to the victim.
Consequently, Abdela’s assertion in her plea allocution that she saw the deceased being attacked with a knife before she acted was essential to establish her state of mind. Deliberately disabling the deceased, knowing he was being attacked by another person with a knife, is probative of her intent and reasonably and logically pointed to the conclusion that when she acted, she did so with the intent to help another inflict serious physical injury on the deceased.
Acknowledgement of the acts of the person whom she aided was therefore necessary to establish the elements of the crime to which Abdela pleaded. Merely kicking the legs out from under the deceased while he was in a struggle, deleting any reference to Vasquez’s conduct which threatened serious physical injury, would not have met the requirements of the plea, and would not have accurately conveyed the extent to which Abdela’s declarations were adverse to her penal interests.
In sum, Abdela’s description of Vasquez’s acts, which occurred simultaneously with her own, was inextricably intertwined with the description of her own acts, in that the combined actions demonstrate Abdela’s mens rea as set forth *867 in the allocution to first degree manslaughter. Moreover, reference to those same acts establishes the manner in which the death was caused; that is, Abdela was acting in concert with another in the commission of the crime. Therefore, since Abdela’s description of Vasquez’s actions was not superfluous to her manslaughter plea, but was, in fact, essential to its validity, and since such description established elements of the homicide charges, I found the entire factual portion of the allocution fell within this hearsay exception and was admissible.[6]
II
EVIDENCE OF IMPEACHMENT CONCERNING DAPHNE ABDELA’S
CREDIBILITY
The admission of Abdela’s plea allocution statement, as an exception to the hearsay rule, did not violate the defendant’s right to confrontation, since the prosecution established sufficient independent evidence of its reliability. The jury, however, as the trier of fact, had the ultimate responsibility of determining the weight to be given the statement. (See, People v Settles, 46 NY2d 154, 170, supra.)
In this regard, the defendant contended that Abdela’s statement was unreliable and that she rather than Vasquez was the killer. A defendant has a right to introduce evidence that a person other than himself committed the crimes and due process requires that he be permitted to introduce proof in support of his contention. (Chambers v Mississippi, 410 US 284, supra.)
Thus, as a matter of due process and consistent with the cautious analysis undertaken by the Thomas Court with respect to the admissibility and use of declarations of codefendants, the defense was permitted to offer evidence affecting Abdela’s credibility, even though by her unavailability, a technical evidentiary foundation could not be established for such evidence.
For example, the defense was permitted to introduce evidence, in the form of a stipulation, that at the time of the hom *868 icicle Abdela was receiving treatment for alcohol and substance abuse, even though, by her absence, she was unable to confirm or deny the assertion. Records were available to confirm the reliability of such a stipulation and there was testimony that on the night of the homicide she appeared to be intoxicated. (Tr. Tr., at 1426.) The defense was also permitted to introduce those portions of Abdela’s statements to the police before and after her arrest, which constituted prior inconsistent statements, even though Abdela was unavailable to confirm, deny or explain them. Several such statements were admitted into evidence, including virtually the entire 911 call which Abdela made to the police, as well as a tape-recorded message she left on a classmate’s answering machine, wherein she arguably admitted greater responsibility for the death of Michael McMorrow.
The defense was also permitted to call witnesses who testified that earlier in the evening of the homicide, Abdela was engaged in a verbal confrontation with a man at a bodega, as evidence that supported the defense contention that her behavior on that night was explosive, angry, aggressive and therefore that she was more likely than the defendant to have committed the crime.
Due process, however, did not extend to waiving other evidentiary standards such as relevance and reliability of proffered defense evidence. (See, Tr. Tr., at 1879-1880, 1893, 1914-1915, 1936, 2287-2289.) Consequently, a defense request to introduce evidence of two instances which, according to the defense, tended to show the “bad” character of Abdela and her propensity to commit murder was denied. (See, Tr. Tr., at 2217-2224.)
In the first incident, the defense sought to establish that Abdela grabbed her father by the neck and slapped him during a confrontation because she came home late on May 12, 1997. The defense sought to prove this incident through the testimony of a police officer who took a report from Abdela’s parent.
In the second incident, a day or so before May 23, 1997, Abdela allegedly registered under an assumed name in a hotel with a 28-year-old man and was allegedly overheard making threatening remarks to him. The defense sought to establish this incident through the testimony of a desk clerk who overheard the statement.
A single physical confrontation between a teenager and a parent over late hours, although disturbing, is not indicative of a homicidal bent. Nor would a confrontation during an as *869 signation between an “older” man and a 15 year old be significantly probative of a homicidal nature. This evidence, if true, was indicative of a troubled adolescence on the part of Abdela, but its probative value, as demonstrative of a propensity to commit murder, was slight at best and certainly did not outweigh its prejudicial and misleading impact. Moreover, the defense sought to establish these incidents through essentially hearsay testimony, further undermining their reliability.
Ill
EVIDENCE OF DEFENDANT’S POSSESSION OF A KNIFE
The defendant, in his opening statement, put in issue the prosecution’s contention that the defendant was the knife wielder, alleging, instead, that Abdela was solely responsible for the death of Michael McMorrow. He also cast doubt on the prosecution’s assertion that the murder weapon was the knife found in defendant’s apartment. (Tr. Tr., at 63-66, 92, 94-96.)
At the trial, the People sought to prove that the defendant possessed a knife, and to provide an explanation as to why he would have carried it on the night of the homicide. The prosecution was permitted to call a witness who was a classmate of the defendant and who knew him since Valentine’s Day, February 14, 1997. This witness testified that one day in late April 1997, she saw the defendant at school with a black eye. She was concerned and asked him what had happened. The defendant told her that a few days before he had been jumped by several teenagers on the subway. (A police officer testified that on April 14, 1997, she responded to the defendant’s home and took a report of the incident from the defendant and his mother.) The classmate further testified: “[H]e told me that some kids had jumped him. He said he knew them but he had saw * * * he had seen them before but he didn’t really know them, and I asked him, you know, aren’t you worried, aren’t you scared at all? He didn’t seem very upset about it. And then he told me that he got a knife and that so in case it ever happened again, he had protection, and he patted to his pants leg, but I never saw it” (Tr. Tr., at 1818).
This witness’ testimony was essentially uncontradicted by the defense’s cross-examination or by any other evidence in the case. The fact that the defendant possessed a knife prior to the homicide as well as the fact of the April assault was ultimately confirmed by the evidence adduced by the defense as well. (See, testimony of defendant’s father and mother, Tr. Tr., at 2812-2816, 2830-2839, respectively.)
*870 It is generally improper to prove that a person performed an act on a particular occasion, by showing that he performed a “similar” act on a different, unrelated prior occasion, especially if the only purpose of the offered testimony is to show the defendant’s propensity to commit a certain bad act or to show bad character.[7] However, evidence is admissible if it is relevant, i.e., if it tends to make the existence of a fact more likely than not, and if its probative value is not substantially outweighed by its prejudice to the defendant. (Prince, Richardson on Evidence § 4-101 [Farrell 11th ed].) It follows that, if the prior act is relevant to prove an element of the crime or another significant issue, as opposed to mere propensity, then it may be admissible, if the probative value of the testimony outweighs the prejudicial impact. Evidence that defendant stated that he carried a knife for protection, revealing a present intention to do so in the future, is clearly relevant since it made his possession of a knife on the night of the homicide more likely than not. A declaration of “a presently existing intention to do a future act, when made in apparent good faith, [is] admissible as an exception to the hearsay rule to prove performance of that act”. (Fisch, New York Evidence § 999, at 575 [2d ed].) Its admission is in the discretion of the Trial Judge.
The prosecution contended that the defendant was the knife wielder, that he was the killer and not Abdela. Consequently, evidence that the defendant cárried a knife was material to that issue. From the disclosed intent to do a particular act, an inference that the act was performed may fairly be drawn. The defendant carried a knife for protection — that he continued to do so on the night of the homicide was a fair inference.
In terms of the prejudicial impact of this evidence, it should be noted that evidence relevant to an issue tending to explain an act should not be held inadmissible because it also tends to be inculpatory, provided that it has sufficient probative value to outweigh any prejudicial effect. Finally, the jury was specifically charged both when this witness testified and in the final charge, that the fact that this evidence may have indicated that the defendant possessed a knife on a prior occasion was no proof whatsoever that he possessed a propensity or disposition to commit the crimes charged or any other crime.
*871 IV
THE SUBMISSION OF LESSER INCLUDED OFFENSES
The law requires the submission of lesser included offenses if there is any reasonable view of the evidence which would permit a jury to find a defendant guilty of the lesser offense and not guilty of the greater. It is reversible error for a Trial Judge not to charge a lesser offense, when such a reasonable view exists and the defense requests submission. (See, CPL 300.50 [1], [2].)
In the instant case, the defense requested submission of manslaughter in the first degree under the theory that defendant only intended to cause serious physical injury when he acted, and manslaughter in the second degree under the theory that when he acted, he acted “recklessly”. The defense contended that the jury could reasonably conclude that Abdela was more culpable than the defendant, that she took a more active role than that contended by the prosecution, and that even if the jury concluded that the defendant was not simply an innocent bystander, his role and intent were distinct from that of Abdela.
In determining whether to submit a lesser included offense, the law does not permit a Trial Judge to speculate as to what will be the ultimate finding of the jury, but simply requires the court to determine if there is a reasonable view of the facts which would support a conviction of the lesser but not the greater offense, despite the court’s opinion concerning that view. (People v Discala, 45 NY2d 38.) In making this determination, “it has been emphasized that ‘[t]he court’s appraisal of the persuasiveness of the evidence indicating guilt of the higher count is irrelevant’ (People v Henderson, 41 NY2d 233, 236). Rather, the focus is on whether there is some reasonable basis in the evidence for finding the accused innocent of the higher crime, and yet guilty of the lower one (id.)”. (People v Discala, supra, at 41.)
Consequently, evaluating the evidence in a light most favorable to the defense, as the law required, and recognizing that a jury could decide to accept only part of the prosecution’s proof, this court concluded that on the entire record, there was a rational basis on which the jury could find the defendant guilty of a lesser but not the greater offense.
The evidence revealed that Abdela had a pugnacious, perhaps even belligerent attitude on the day of the homicide. Also, defense witness Carlos Magriz testified that he saw her *872 several hours before the crime in Carl Schurz Park and that she was in possession of a black-handled folding knife (a knife similar in description to that found in defendant Vasquez’s apartment). When she left the park she said, in substance, that she was going to end up killing someone that day. (Tr. Tr., at 2340-2390.)
Since there was no available eyewitness to the crime, the forensic evidence played a key role in reconstructing the circumstances surrounding the killing of the deceased. This evidence revealed a significant fact — the mortal or immediately life-threatening wounds, as well as the numerous “slashing” wounds, were inflicted while the deceased was supine and motionless on the ground. (Tr. Tr., at 1150-1151, 2453-2459.) Consequently, evidence tending to identify the person responsible for inflictiiig those fatal wounds was crucial in determining the intent of that person. In this regard, the forensic evidence also demonstrated that the deceased’s blood was found on Abdela’s roller blades, whereas none of the deceased’s blood was on Vasquez’s roller blades. Moreover, the only blood droppings identified as coming from Vasquez were found no closer than four and one-half feet from the area where the mortal wounds were inflicted. This evidence thus raised the inference that Abdela, and not Vasquez, was in a position to inflict the fatal wounds.
Evidence also established that the knife which was found in Vasquez’s home had a bent tip which could have been caused, according to the prosecution’s Medical Examiner, by the infliction of a nonfatal wound to the deceased’s collar bone. (See, Tr. Tr., at 1147-1149, 1161-1164.) A defense expert testified, in contradiction to the prosecution’s expert, that the fatal wounds were not consistent with a knife possessing such a bent tip, assuming that the condition of the tip preceded the infliction of those wounds, raising an inference that the knife found in defendant’s apartment was not the knife used to inflict the fatal wounds. (Tr. Tr., at 2451-2453.)
The evidence at trial thus clearly presented a question of fact for the jury concerning the extent of Vasquez’s participation in the homicide and the nature of his intent. The testimony of Magriz, if found credible by the jury, coupled with the aforesaid forensic evidence is reasonably susceptible to an interpretation that Abdela, rather than Vasquez, was responsible for inflicting the mortal wounds.
In sum, regardless of the court’s view of the persuasiveness of the evidence, the jury could have reasonably concluded that *873 the defendant was responsible for the nonfatal injury to the collar bone of the deceased and that the defendant’s intent up to that point constituted an intent to cause serious physical injury or recklessness.
Neither the sheer number of the wounds, nor their gruesome nature, could be dispositive of the issue of whether to submit a lesser charge, given the circumstantial nature of the evidence, the testimony of Magriz, the conflicting forensic evidence and the issues raised concerning the extent of Abdela’s participation in the crime. The jury could have reasonably concluded that the truth was somewhere between the versions postulated by the prosecution and the defense.

. Tr. Tr. refers to trial transcript.

. A “Queen for a day” agreement permits a cooperative witness to tell what he knows about a crime with an agreement by the prosecution not to use anything he may say directly against him if he goes to trial.

. Abdela’s attorney requested that the court and prosecutrix consider a lesser sentence but this proposal was rejected.

. Pursuant to this reasoning, the First Department has recently held that if the standards for admissibility are met, even a videotaped confession of a codefendant can be admitted into evidence on the People’s direct case as a declaration against penal interest. (See, People v Daughtry, 254 AD2d 193.)

. A person is guilty of manslaughter in the first degree when “[w]ith intent to cause serious physical injury to another person, he causes the death of such person” (Penal Law § 125.20 [1]).

. During the trial, the circumstances surrounding the taking of the plea allocution, as well as the chronology of preceding meetings between Abdela and law enforcement officials, were explored by defense counsel. A limiting instruction was given to the jury, both at the time that the evidence was admitted on the People’s direct case, as well as during the court’s final charge, regarding the purpose for which the jury was to consider this evidence, as well as the manner in which they were to assess its trustworthiness and reliability.

. As noted, this court ruled inadmissible the evidence offered by the defense with respect to Abdela’s confrontation with her father and the incident at the hotel since those incidents were offered solely to establish a tenuous propensity between those acts and the crime charged.